## Pew Trust.

Argued January 9, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Paul Maloney*, with him *Peter Hearn, Franklin C. Hutchinson*, and *Pepper, Hamilton & Scheetz*, for appellant.

*M. Paul Smith*, with him *Richard L. Grossman*, and *Smith, Cahall & Aker*, for appellee.

Opinion by Mr. Chief Justice Bell, May 29, 1963:

The basic question here involved is whether a 6% common stock dividend of Sun Oil Company stock is a part of the net income which was given by the settlor to the life tenant, or whether the stock should be awarded to principal.

Mary C. Pew, on June 2, *1932,* executed an inter vivos deed of trust in which she created an irrevocable spendthrift trust for the benefit of her two grandsons, Arthur E. Pew, Jr., and Walter C. Pew, and their respective children, as therein specifically set forth. Under the terms of the trust one-half of the corpus was to be held to pay the net income to Arthur E. Pew, Jr., for life and on his death to pay the net income "in equal shares for the support, maintenance, and education" of his children until they respectively attain the age of 24.* The other one-half of the corpus is held for the benefit of Walter C. Pew and his children upon exactly the same terms. This latter trust is not presently before the Court.

The trust consisted originally of 40,000 shares of the common stock of the Sun Oil Company. The settlor directed the trustees to "set aside 20,000 shares** of the common stock of said Sun Oil Company" for Arthur E. Pew, Jr., and his children as aforesaid, and 20,000 shares for Walter C. Pew, and his children as aforesaid. Common Stock of the Sun Oil Company was and still is the *sole* asset of each trust.

On December 8, *1961,* the trustees of the Mary C. Pew Trust for Arthur E. Pew, Jr., et al., received from

---

* Upon attaining the age of 24, each of the children is given 20% "of their respective shares or portions of said fund, per stirpes, absolutely," at age 28 an additional 30% of his respective share or portion "per stirpes, absolutely" and at age 32 the balance of the principal of his respective share or portion of the trust is given "per stirpes absolutely."

** The Arthur E. Pew, Jr., trust now holds 30,694 shares of said stock.

the Sun Oil Company a stock dividend of 6% or 1,- 841.64 shares of the common stock of Sun Oil Company. Arthur E. Pew, Jr., the life tenant, claimed that he was entitled to this stock dividend as part of the income of the Trust. The guardian ad litem for various minor children and issue and all unascertained persons, claimed the dividend was a part of the principal of the trust. The life tenant appealed from the final Order (or Decree) of the Orphans' Court which, relying upon *Catherwood Trust*, 405 Pa. 61, 173 A. 2d 86, awarded the shares to principal.

Appellant contends he is entitled to this 6% stock dividend (1) under the principle of "res adjudicata," citing *Wallace's Estate*, 316 Pa. 148, 153, 174 A. 397, see also *Downing v. Halle Bros. Co.*, 395 Pa. 402, 150 A. 2d 719; also *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 100 A. 2d 595; and (2) under the principle of "the law of the case," citing *Brown Estate*, 408 Pa. 214, 230, 231, 183 A. 2d 307, and *Burke v. Pittsburgh Limestone Corp.*, supra; and (3) under "due process of law," citing *Willcox v. Penn Mutual Life Insurance Company*, 357 Pa. 581, 55 A. 2d 521, and *Liggett Co. v. Baldridge*, 278 U.S. 105; and (4) because an award to principal would "impair the obligation of the contract," viz., the deed of trust, thus contravening Article I, §17, of the Constitution of Pennsylvania, and Article I, §10, Clause 1, of the Constitution of the United States, citing *Cross Lake Club v. Louisiana*, 224 U.S. 632; see also *Dartmouth College v. Woodward*, 6 Wheaton 518, 17 U.S. 518, and *Treigle v. Acme Homestead Assn.*, 297 U.S. 189, and *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95.

Mr. J. Howard Pew, one of the trustees, testified at the audit that just before his mother, Mary C. Pew (the settlor) created the trust—and after she learned the wishes of her two grandchildren, Arthur E. Pew, Jr., and Walter C. Pew,—she told him that she wished

Arthur and Walter to receive all stock dividends from this Trust; and that this was her intent when she created the trust. We agree with the decision and the Opinion of the Auditing Judge that this testimony was inadmissible. Cf. *Beisgen Estate,* 387 Pa. 425, 430, 431, 432, 128 A. 2d 52; *Penrose's Estate,* 317 Pa. 444, 176 A. 738; *Dembinski's Estate,* 316 Pa. 61, 173 A. 314; *Willard's Estate,* 68 Pa. 327.

In *Pew Trust,* 362 Pa. 468, Mr. Justice ALLEN M. STEARNE, speaking for a unanimous Court, specifically held in an audit of an account *in this very trust* (1) that Arthur E. Pew, Jr., the life tenant had a vested interest under the terms of the trust, not only in ordinary stock dividends, but also in the extraordinary stock dividends—and he has been receiving all stock dividends (with one exception when the dividend was apportioned) since the inception of the trust until the present challenged dividend; and (2) that to apply the Principal and Income Act of 1947 to this trust which was created in 1932 would be *unconstitutional!* The Court pertinently said (page 469) : "The provisions of the Uniform Principal and Income Act of May 3, 1945, P. L. 416, 20 P.S. §3471, and the Principal and Income Act of July 3, 1947, P. L. 1283, 20 P.S. §3470, are *unconstitutional* when applied *retroactively* to trusts created prior to their enactments."

In *Crawford Estate,* 362 Pa. 458, 67 A. 2d 124, and in *Steele Estate,* 377 Pa. 250, 103 A. 2d 409, and in *Jones Estate,* 377 Pa. 473, 105 A. 2d 353, and in *Warden Trust,* 382 Pa. 311, 115 A. 2d 159, and, as recently as 1959, in *Cunningham Estate,* 395 Pa. 1, 149 A. 2d 72, the Court unanimously reaffirmed the constitutional right of a life tenant in a trust created prior to the Principal and Income Act to both ordinary stock dividends and an apportionable part of extraordinary stock dividends.

· However, in *Catherwood Trust*, 405 Pa., supra, the Court specifically overruled *Pew Trust, Crawford Estate* and *Warden Trust*, and impliedly overruled *Steele Estate, Jones Estate* and *Cunningham Estate.** In *Catherwood Trust* the Court further declared to be "constitutional" what, in the prior decisions above mentioned, this Court had repeatedly held to be *unconstitutional*. The Court said (pages 68-69, 70, 74-75 and 77): "This Court held that the decisional law embodied in the Pennsylvania Rule established in the life tenant a *vested property right* and that the provisions of the 1945 Act providing for its retroactive application to trusts created prior to the Act were constitutionally inhibited by Article I, §§1 and 9 of the Pennsylvania Constitution and the 14th Amendment to the U. S. Constitution. . . . On the same day Crawford was handed down by this Court, Pew Trust, 362 Pa. 468, 67 A. 2d 129, was decided. In Pew, relying on Crawford, we held that the retroactive provisions of both the 1945 and 1947 Acts were unconstitutional when applied retroactively to trusts created prior to their passage. References to our holdings in Crawford and Pew were later made in and affirmed in Steele Estate, 377 Pa. 250, 103 A. 2d 409; Jones Estate, 377 Pa. 473, 105 A. 2d 353. Finally, in Warden Trust, 382 Pa. 311, 115 A. 2d 159 we decided that a life tenant had a vested property right in extraordinary dividends declared on stock *acquired after* the effective date of the 1947 Act and that such Act could not be constitutionally applied to stock acquired by trusts created prior to the Act even though the acquisition of such stock took place after passage of the Act. . . . In Cunningham Estate, supra, . . . noting the unworkability of the Rule, we refused to extend its appli-

---

* The writer of the present Opinion filed a vigorous dissenting (and concurring) Opinion in which Mr. Justice MUSMANNO joined.

cation to events other than those recognized as apportionable prior to the effective date of the 1945 Act,[*] and we therein stated: 'Present day economic conditions, particularly in the corporate field, present a drastic contrast to the economic conditions in existence at the inception of and during the formative years of the Rule, and corporate practices plus multiplication and extension of taxes has made the application of the Rule even more difficult and often unworkable. The complexities, the uncertainties, and the difficulties which are inherent in the application and administration of the Rule have too often in these modern times created confusion, injustices and glaring inconsistencies. . . . The purpose and aim of the Rule was commendable: It sought, and was generally acknowledged to have achieved, an equitable adjustment of the rights of both life tenants and remainderman . . . ." The Court then abolished in futuro the Court-made Rule of Apportionment and held that it was not, even as to prior trusts, constitutionally inhibited.

In *Catherwood Trust* the Court was vitally concerned with the apportionment of extraordinary stock dividends and the apportionment of proceeds of sales of stock. In that case the Court, we repeat, *abolished in futuro the long established Pennsylvania Rule of Apportionment of extraordinary stock dividends and of proceeds of sales of stock.* Never in Pennsylvania's long history until 1945,[*] had a life tenant's right to ordinary cash and *ordinary* stock dividends been denied.[**] In all the history of Pennsylvania Rule of Apportionment this Court has never held that stock divi-

---

[*] (1) The distribution by the corporation of an *extraordinary* cash or stock dividend, or (2) the liquidation of the corporation, or (3) a sale of the stock by the trustees, or (4) the issuance of stock rights.

[**] When a change or modification was made by the Legislature.

dends, up to and including 6%, were apportionable, but on the contrary all such dividends were considered income. *Catherwood* recognized and confirmed this historical fact. We believe it was not the intent of the Court in the *Catherwood* decision—but if it was, the dicta in a footnote* to that effect is hereby overruled—to abolish the right of a life tenant to *ordinary* stock dividends or ordinary cash dividends in pre-1945 trusts, neither of which had ever been subject to the Pennsylvania Equitable Rule of Apportionment or had ever caused "confusion or complexities or uncertainties or difficulties or glaring inconsistencies, nor unworkability"—which was the "rationale" given for the abolition of the Pennsylvania Rule of Apportionment and which, we repeat, had never been applicable to ordinary dividends. On the contrary the Court was unanimous in affirmatively holding that stock distributions of 6% or less belonged to the life tenant. For example, the majority Opinion said (pages 77 and 78): *"If a total stock distribution for the current year is payable at the rate of 6% or less of the corporation's outstanding shares before such distributions were made, such distribution in stock of the distributing corporation should be treated as income."*

As further evidencing the intent of the entire Court in that case, the concurring and dissenting Opinion commenced as follows: "I enthusiastically agree with that part of the majority Opinion which holds that small stock dividends which do not exceed 6% in that particular year belong to the life tenant and are not subject to apportionment."

Appellant moreover vigorously argues that the following sentence in the Opinion of the Court in *Catherwood Trust* constituted merely "dicta" and should not

---

* The footnote at the end of that Opinion reads (page 78): "This statement applies to all receipts, including stock distributions of six (6%) per cent or less."

be followed, and for this and several other reasons it is not applicable to this Trust, viz., "In all audits now pending and henceforth, distributions shall be made under the provisions of the Principal and Income Act of 1947."

Appellant is correct when he terms the aforesaid statement "dicta",* but *so far as concerns the Pennsylvania Rule of Equitable Apportionment of extraordinary dividends and proceeds of sale of stock* which the majority therein abolished, it is as controlling as if it were an indispensable part and parcel of the precise decision of the Court on the actual issues in *Catherwood Trust.* Dictum which is contained in an Opinion and not in a footnote, is sometimes as strong and controlling as a decision on the merits; indeed, Opinions containing dicta are sometimes more carefully and thoroughly considered than some Opinions which are restricted solely to the merits, and others which are "Per Curiam". There are many outstanding examples of the decisive effect of dicta. Probably the leading case in all the legal history of Pennsylvania is *Commonwealth v. Drum,* 58 Pa. 9—yet few realize that the Court's Opinion in *Commonwealth v. Drum* was purely dicta. *Nirdlinger's Estate,* 290 Pa. 457, 139 A. 200, and *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295, are other striking examples where the Court wisely set up, by dicta, clear guideposts which were intended to be followed and were followed by this Court for very many years. It follows from what has been said, that the aforesaid dictum in *Catherwood Trust* discontinuing in futuro the apportionment of extraordinary stock dividends and of the proceeds of sale of stock is now controlling law. However, we repeat, that dictum referred to and must be confined to an apportionment of proceeds of sale of stock and of extraordinary stock divi-

---

* More accurately "dictum".

dends—it had no reference or application to ordinary stock dividends. General expressions in an opinion must be considered in the light of and cannot be dissevered from the facts of that case; what is actually decided and controlling is the law applicable to the particular facts of that particular case and while all other statements and conclusions therein are entitled to great consideration they are not controlling. *Weyerhaeuser v. Hoyt,* 219 U.S. 381, 394; *Cohens v. Virginia,* 6 Wheat. 264, 399; *Schuetz's Estate,* 315 Pa. 105, 109, 172 A. 865; *Welsch v. Pittsburgh Terminal Coal Corp.,* 303 Pa. 405, 408, 154 A. 716; *Erie City's Appeal,* 297 Pa. 260, 266, 147 A. 58; *Hill v. Houpt,* 292 Pa. 339, 342, 141 A. 159.

Appellant next contends that in any event he is entitled to the dividend under the proviso of Section 2 of the Principal and Income Act of 1947. In considering this contention, we shall assume arguendo (as does the appellant) that the dicta set forth in the footnote at the end of the majority opinion in *Catherwood Trust* is controlling. That footnote reads as follows: "This statement applies to all receipts, including stock distributions of six (6%) per cent or less."

Turning now to the aforesaid "proviso", it reads: "Provided, That the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee or other person, to do so and such provision and direction, where not otherwise contrary to law, shall control, *notwithstanding this act.*"*

The object and purpose of this proviso was undoubtedly to preserve to every settlor and every testator his basic centuries old right to determine to whom his property should go, and how—whether outright, or con-

---

* Italics throughout, ours.

ditionally, or in trust, i.e., what he wanted to go to his life tenant as income and what to his remainderman as principal. In order to ascertain the settlor's meaning and intent, we must therefore interpret the language and intent of this proviso (which was never intended to negate the settlor's or testator's wishes and intent) in its application to trusts (and wills) created (a) prior to and (b) subsequent to July 3, 1947.

It is still hornbook law that the pole star in every trust (and in every will) is the settlor's (or testator's) intent and that intent must prevail. · It would certainly be unreasonable to construe the proviso as intending to destroy or effectually nullify what has always been considered the inherent basic fundamental right of every owner of property to dispose of his own property as he desires, so long as it is not unlawful: *Stoffel's Estate*, 295 Pa. 248, 145 A. 70; *Borsch Estate*, 362 Pa. 581, 67 A. 2d 119; *Grote Trust*, 390 Pa. 261, 135 A. 2d 383; *Brown Estate*, 408 Pa. 214, 183 A. 2d 307. If, therefore, under the language of this 1932 deed of trust the settlor intended small stock dividends to be and go to her life tenant as part of *income*, her intent will be sustained and carried out, even though in this 1932 Trust Deed (and in all pre-1945 trusts) the gift of dividends (and similarly a gift of interest on bonds and on mortgages) or their ascertainment is not specifically spelled out or directed by the settlor.

In *Walton Estate,* 409 Pa. 225, 186 A. 2d 32, the Court aptly and relevantly said (page 231) : " ' " 'No rule regarding wills is more settled than the great General Rule that the testator's intent, if it is not unlawful, must prevail' " ' : Collins Estate, 393 Pa. 519, 522, 143 A. 2d 45. We reiterate what by now is hornbook law : ' "The testator's intention is the pole star in the construction of every will and that intention must be ascertained from the language and scheme of his entire will [together with the surrounding facts and circum-

stances] .... Kelsey Estate, 393 Pa. 513, 143 A. 2d 42; Britt Estate, 369 Pa. 450, 87 A. 2d 243; Sowers Estate, 383 Pa. 566, 119 A. 2d 60; Cannistra Estate, 384 Pa. 605, 121 A. 2d 157." Saunders Estate, 393 Pa. 527, 529, 143 A. 2d 367. . . .': Woodward Estate, 407 Pa. 638, 640, 182 A. 2d 732." This same principle is equally applicable to trusts, both inter vivos and testamentary. Inter vivos trusts: *Scholler Trust,* 403 Pa. 97, 169 A. 2d 554; *Wolters Estate,* 359 Pa. 520, 59 A. 2d 147; testamentary trusts: *Walton Estate,* 409 Pa., supra; *Althouse Estate,* 404 Pa. 412, 172 A. 2d 146; *Woodward Estate,* supra; *Britt Estate,* supra; *Newlin Estate,* 367 Pa. 527, 80 A. 2d 819.

In order to ascertain the actual intent of the settlor or testator, the Court must place itself in his armchair and consider not only the language and scheme of the instrument but also the facts and circumstances with which he was surrounded; and these surrounding facts and circumstances include the condition of his family, the natural objects of his bounty and the amount and character of his property: *Woodward Estate,* 407 Pa. 638, 640, 182 A. 2d 732; *Britt Estate,* 369 Pa. 450, 455, 87 A. 2d 243; *Newlin Estate,* 367 Pa. 527, 80 A. 2d 819. Of course Mrs. Pew's intent must be determined as of the date of the creation of the trust in 1932 and not in 1947, when the Legislature passed the above proviso. *Fischer & Porter Co. v. Porter,* 364 Pa. 495, 72 A. 2d 98; 54 Am. Jur. §18, p. 36; 90 C.J.S., Trusts, §162 (1955). As the Court aptly said in *Schaad v. Hotel Easton Co.,* 369 Pa. 486, 87 A. 2d 227 (page 491), ". . . 'no principle is more firmly established than that the laws which were in force at the time and place of the making of the contract enter into its obligation with the same effect as if expressly incorporated in its terms': Beaver County Building and Loan Association v. Winowich, 323 Pa. 483, 489, 187 A. 481, 484. . . .''

We must therefore construe the 1947 proviso in its application to this 1932 trust in the light of her language *which in 1932 had a clear meaning* to laymen, lawyers and Judges alike. To require a settlor (or a testator) who created a trust many (15) years before the Act of 1947 (or any similar Act was passed) "to *expressly* spell out his directions as to what was and was not 'income' and thus express his intent *in the identical* language used or required by a later Act" would obviously be unreasonable and absurd; and we cannot impute such an intent to the legislature. See *Brown Estate*, 408 Pa. 214, 227, 183 A. 2d 307; *Saunders Estate*, 393 Pa. 527, 143 A. 2d 367. Although no example is needed to illustrate what is so obvious, neither a legislature nor a Court could provide that in *prior* wills and trusts, the words "net income" shall not include interest on bonds, or on mortgages, or *any* stock dividend unless the testator or settlor *specifically and expressly* included them in his gift of "net income."

Arthur E. Pew, Jr., and settlor's other grandson, Walter C. Pew, the life tenants, were undoubtedly the primary objects of the settlor's bounty. Their grandmother, Mary C. Pew, the settlor, was the widow of J. N. Pew, who was the founder of the Sun Oil Company. Since 1926 the Sun Oil Company had paid a small yearly cash dividend of $1.00,* and since 1913 *small* (6% or less) stock dividends in many years in varying percentages. Every stockholder and especially *every Pew* stockholder knew that that was the well known, established and ordained policy of the Sun Oil Company.

While very few lawyers knew or could unravel and very, very, very few laymen knew or had ever heard of Pennsylvania's equitable Rule of Apportionment of extraordinary stock dividends and of proceeds of sale

---

* With one exception.

of stock, every lawyer *and every layman* (testator and settlor alike) and every cestui que trust knew that small stock dividends had for over 100 years *always* been considered to belong to the life tenants who were (almost always) the primary objects of the settlor's bounty and not to great grandchildren\* or unknown or unborn remaindermen. Indeed, if Mrs. Pew had wished and intended all stock dividends (including those which represented earnings) to be a part of principal, such a provision and intent would have been illegal in 1932 as in violation of the then rule against accumulations: See *Warden Trust,* 382 Pa. 311, 115 A. 2d 159; *Cannistra Estate,* 384 Pa. 605, 121 A. 2d 157; Act of April 18, 1853, P. L. 503. The following wise aphorism expressed the thought of all—life tenants who were the primary objects of testator's or settlor's bounty should not be forced to starve in order that future remaindermen\* might feast. For many stockholders and certainly for many stockholders of Sun Oil Company stock,—who received only $1.00 a share cash dividends, while shareholders in other large corporations received annually $5.00 or $6.00 or $9.00 a share—these small stock dividends were their bread and butter.

To summarize: We hold (1) that as to wills of persons dying before and inter vivos trusts created prior to the effective date of the Principal and Income Act of 1945, a gift of income or net income included small stock dividends of 6% or less, unless the testator or settlor clearly expressed a contrary intent; and (2) it is especially clear that in the light of the facts and circumstances which surrounded Mrs. Pew at the time she created the trust, she gave and intended to give to her grandson Arthur E. Pew, Jr., the life tenant of this

---

\* Many of whom were often unknown to the testator or settlor. See *Nirdlinger's Estate,* 327 Pa. 171, 173, supra; 331 Pa. 135, 138, supra.

trust, the small stock dividends of 6% or less, as well as the cash dividends which were paid annually, or as often as possible, to the owners of the common stock of the Sun Oil Company.

In view of our interpretation of this trust, it is unnecessary to decide or even to discuss the various other legal and constitutional contentions made by appellant or by appellee.

Decree reversed, case remanded to the Orphans' Court with directions to enter a decree in conformity with this Opinion; costs to be paid out of the principal of the trust.

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

The majority opinion states the basic question on this appeal to be: "Whether a 6% per cent common stock dividend of Sun Oil Company stock is a part of the net income which was given by the settlor [of the trust] to the life tenant, or whether the stock should be awarded to principal." *As stated,* this question omits any reference to certain stipulated facts the consideration of which is vital to a resolution of the question: (1) this six per cent stock dividend was received by the trustees from Sun Oil Company on *December 8, 1961;* (2) this dividend was payable on shares of Sun Oil Company *in* shares of stock of Sun Oil Company and such shares were of the same kind and rank as the shares upon which the dividend was paid.[1] The importance of such facts is two-fold: (1) this particular stock dividend was paid *after* the decision of this Court in *Catherwood Trust,* 405 Pa. 61, 173 A. 2d 86, which abolished *prospectively* the Pennsylvania Rule of Appor-

---

[1] The trustees "received 1841.64 shares of Sun Oil Company common stock, as a result of a six per cent stock dividend declared on the 30,694 shares held by [the trustees] in principal." Fact (1) in Stipulation of Counsel.

tionment [the Rule] as to stock dividends and applied to the distribution of future stock dividends the provisions of the Principal and Income Act of 1947 [the Act] ;[2] (2) this particular stock dividend falls *squarely* within the class of dividends deemed to be principal under Section 5 (1) of the Act.

The majority opinion reaches the conclusion that this particular 6% common stock dividend of the Sun Oil Company constitutes "net income" given by the settlor of this trust to the life tenant. In arriving at this conclusion, the majority opinion does so upon four premises: *first,* it holds that "[n]ever in Pennsylvania's long history until 1945 [when a change or modification was made by the Legislature] had a life tenant's right to ordinary cash and *ordinary* stock dividends been denied" and that "[in] all the history of Pennsylvania Rule of Apportionment this Court has never held that stock dividends, up to and including 6%, were apportionable, but on the contrary all such dividends were considered income."; *second,* that it was not the intent of this Court in *Catherwood* to abolish the right of a life tenant to "ordinary stock dividends", i.e., stock dividends which do not exceed six per cent in any one year; *third,* that if the statement in the footnote (p. 78) in *Catherwood,* reading as follows: "This statement [*in all audits now pending and henceforth,* distributions shall be made under the provisions of the Principal and Income Act of 1947] *applies to all receipts, including stock distributions of six (6%) per cent or less*\* . . .", *was intended* by this Court to subject the distribution of such ordinary small stock dividends to the provisions of the Principal and Income Act of 1947, supra, then such statement in the footnote is overruled; *fourth,* that, even though such statement

---

[2] Act of July 3, 1947, P. L. 1283, 20 PS §3470.1 et seq.

\* Emphasis supplied.

in the footnote in *Catherwood* be not overruled but considered controlling, nevertheless, *under the instant factual situation,* the life tenants are entitled to distribution of this stock dividend under the provisions of Section 2 of the Act, supra. With the last three premises expressed in the majority opinion I cannot agree and to a discussion of such premises I particularly direct my dissent.

In the first place, I agree that this Court in its application, for approximately one hundred years, of the Rule never held that the declaration of ordinary common stock dividends, not exceeding 6% in any one year, constituted an apportionable event. In *Catherwood,* (pp. 77, 78), we expressly stated: "While we have never held that ordinary small stock dividends should be considered as income payable to the life tenant, we have not held to the contrary; our prior decisions dealt with stock dividends, extraordinary in nature. If a total stock distribution for the current year is payable at the rate of 6% or less of the corporation's outstanding shares before such distributions were made such distribution in stock of the distributing corporation should be treated as income." The majority opinion correctly states that, under the Rule, ordinary small stock dividends, not exceeding 6% in any one year, were not apportionable and were deemed income payable to the life tenant, and, therefore, I agree with its first premise. From such premise, however, it cannot be argued that *this* stock dividend shall be deemed income because *prior* to the payment of such dividend this Court in *Catherwood* abolished *prospectively* the Rule and declared that *thereafter* the distribution of stock dividends should be governed by the provisions of the act. While the majority opinion correctly states the manner of distribution of such stock dividends *under the Rule,* such statement in nowise controls the manner of distribution thereof *after the Rule has been*

*abolished.* In my view, the first premise of the majority opinion, while historically correct, is of no moment in determining the distribution of this stock dividend paid after the Rule had been abolished.

The second premise of the majority is that it was not the intent of this Court in *Catherwood* to abolish the rights of life tenants to "ordinary small dividends". The majority would affirm, with the one exception noted hereafter, the ruling in *Catherwood* and yet exclude from the impact of *Catherwood* ordinary stock dividends, not exceeding 6% in any one year. Such a position is untenable. *Catherwood* abolished the Rule as to *all* stock dividends, large or small, ordinary or extraordinary, and made applicable thereafter the provisions of the Act to *all* distributions of *all* stock dividends and *Catherwood* drew no distinction between the classes and types of stock dividends to the distribution of which *thereafter* the provisions of the Act would be applicable. In abolishing what had become an unworkable rule of apportionment, *Catherwood* subjected *thereafter* the distribution of *all* stock dividends to the mandate of the Act rather than to a court-made rule of apportionment. In its second premise, the majority opinion misconceives the intent of this Court expressed in *Catherwood* and would differentiate between classes of stock dividends when no such differentiation was either made or intended to be made. If the majority of this Court want to overrule *Catherwood,* such is its privilege. My concern is that, if *Catherwood* is to be overruled, such overruling should be accomplished *expressly* and not in the manner implicit in the second premise of the majority opinion.

An examination of the third premise of the majority opinion leads inevitably to the conclusion that the majority of this Court would now overrule *at least* the statement made in the footnote in *Catherwood.* The majority of this Court now find, in effect, that this

statement in the footnote in *Catherwood* should be overruled, that ordinary small stock dividends, not exceeding 6% or less, should be treated as income payable to the life tenant, and that Section 5 (1), of the Act, supra, should not apply to such dividends. In so doing, the majority of this Court becomes impaled on the horns of a dilemma; either it must overrule *Catherwood* in its entirety because *Catherwood* applied to *all* distributions of *all* stock dividends thereafter or accept *Catherwood* and change the clear and unambiguous language of Section 5 (1) of the Act. There can be no other logical approach to the result reached.

Subsection (1) of Section 5 of the Act provides: *"All dividends on shares of a corporation, forming a part of the principal, which are payable in the shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid shall be deemed principal.*\* Subject to the provisions of this section all dividends payable otherwise than in such shares of the corporation itself, including ordinary and extraordinary dividends and dividends payable in shares or other securities or obligations of corporations other than the declaring corporation, shall be deemed income. Where the trustee shall have the option of receiving a dividend, either in cash or in the shares of the declaring corporation, it shall be considered as a cash dividend and deemed income, irrespective of the choice made by the trustee."

The stock dividend in the case at bar is a dividend *on* shares and clearly payable *in* shares of the Sun Oil Company and "of the same kind and rank as the shares on which such dividend is paid." The Principal and Income Act, supra, draws no distinction between small or large, ordinary or extraordinary, stock dividends of such type and character; on the contrary,

---

\* Emphasis supplied.

it provides that *all* such dividends shall be deemed principal. The case at bar presents a classic example of that which we intended by the insertion of our footnote in *Catherwood;* even though, under the Rule, ordinary small stock dividends not exceeding 6% in any one year, were not apportionable and were deemed income payable to the life tenant, upon abolition of the Rule and the application thereto of the Act, such dividends *necessarily* had to be distributed in accordance with the provisions of the Act. *Catherwood* abolished the Rule in its entirety and not partially and rendered applicable all the provisions of the Act thereafter.

I fully believe that it would be most salutary if ordinary small stock dividends, not exceeding 6% in any one year, and payable in shares of the corporation itself of the same rank and kind as the shares upon which the dividend is declared were deemed income payable to the life tenant. However, such a result can *only* be accomplished through the legislative process by an amendment of subsection (1), Section 5, of the statute.

To hold, as the majority of this Court would now do, that the statements in the footnote in *Catherwood* should be overruled and that these ordinary small stock dividends, not exceeding 6%, be held not subject to the provisions of the statute constitutes a complete change and alteration of the clear unequivocal language of the statute, a change which this Court completely lacks the power to accomplish. *Catherwood* requires the application of the Act to the distribution of *all* stock dividends, including the type of stock dividends herein considered, and the provisions of the Act clearly provide that such dividends be deemed principal and not income. I repeat, two alternatives face this Court in order to logically support its conclusion: either to overrule *Catherwood* or to change and alter, by judicial fiat, the *clear* language of the statute and neither alternative will I accept.

The fourth premise of the majority opinion is that, even if the statement in the footnote in *Catherwood* be not overruled, this stock dividend must be deemed income payable to the life tenant by application of Section 2 of the Act. Section 2 provides that the Act "shall govern the ascertainment of income and principal . . . in all cases where a principal has been established with . . . the interposition of a trust": provided that if the settlor himself "direct the manner of ascertainment of income and principal" or "grant discretion to the trustee, or other person, to do so" then such provision and direction shall control, "notwithstanding [the] act." Despite the fact that, in the terms of this trust, the settlor has *not directed* the manner of ascertainment of income and principal and *has not granted any discretion* to the trustees or other person to do so, the majority of this Court now holds Section 2 applicable to the extent that other provisions of the Act, particularly Section 5 (1), supra, are not controlling.

In support of this contention, the majority opinion takes two positions: (a) by the enunciation of a completely *new* rule to effect that, as to all inter vivos trusts created *prior to the* Act, a gift of "income" or "net income" in a trust must be interpreted to include ordinary stock dividends, not exceeding 6% in any one year, and that such dividends must be deemed income payable to the life tenant, *unless the settlor expressed in the trust a contrary intent;* (b) in view of the factual circumstances presented in the case at bar, the settlor by the employment of the term "net income" in the gift to the life tenants evidenced an *intent* that such term include ordinary stock dividends, not exceeding 6% in any one year, of the Sun Oil Company.

An examination of the provisions of Section 2 of the Act and the actual factual situation herein presented reveals the complete unsoundness of both these positions. To adopt the first position of the majority

opinion requires the promulgation of an entirely *new* rule which not only lacks legal authority but which directly conflicts with the ruling in *Catherwood* and, if not, directly contravenes the Act. Such rule certainly conflicts with *Catherwood* wherein we held that *all* stock dividends, regardless of character, were thereafter subject to the Act; even if it did not, it would contravene the Act and would make the general *rule* enunciated in Section 5 (1) the *exception* and a distortion of the *exception* in Section 2 of the *rule*. Unless the majority of this Court now intends to overrule *Catherwood* the rule promulgated in the majority opinion conflicts both with *Catherwood* and the Act.

To adopt the second position taken by the majority opinion requires the substitution in Section 2 of the *intent* of the settlor for the statutorily required *direction* by the settlor or *the grant of discretion* to the trustee or other person to make an ascertainment of income and principal. Such a result can only be accomplished by an amendment of Section 2 and any judicial attempt to effect such a change, as the majority now suggests, would not be a construction, but a complete alteration, of the statutory language.

I could agree with the majority opinion that, under the instant factual situation, the life tenants were the principal objects of settlor's bounty,[3] that it was usu-

---

[3] The majority opinion states, inter alia: ". . . for many stockholders of Sun Oil Company stock,—who received only $1.00 a share cash dividends, while shareholders in other large corporations received annually $5.00 or $6.00 or $9.00 a share—these small stock dividends were their bread and butter." In *Pew Trust*, 398 Pa. 523. 158 A. 2d 522, we outlined the situation in which the present life tenant found himself during the period of 21 years from 1933 to 1954, and stated: "From 1933 through 1954 the [Sun Oil Company's] total earnings with respect to the shares held by this trust were $1,720,326. The cash dividends ($507,049) and the market value of the stock dividends ($2,111,220) received by the [life tenant] totalled $2,618,268, or $897,942 more than the Company earned

ally the policy of the Sun Oil Company—whose stock constitutes the *only* asset of this trust— to declare each year both a cash and a stock dividend and that, since 1926, $1.00 cash dividends have been yearly declared. However, I cannot agree with the statement in the majority opinion that the Sun Oil Company has paid "since 1913 *small* (6% or less) stock dividends in many years in varying percentages", because the record indicates otherwise. The record shows[4] that from 1913 up to and including 1932—the year of creation of this trust—Sun Oil Company paid the following stock dividends: 1913-20%, 1915-60%, 1922-300%, 1925-3%, 1926-6%, 1927-3%, 1928-6%, 1929-9%, 1930-9%, 1932-3%. Thus, in the period *preceding* the creation of this trust, 10 stock dividends were declared of which 5— including the two *immediately* prior to the creation of this trust—were *in excess of 6%*. Assuming therefore, that every Sun Oil Company stockholder *knew* the established policy of the Company as to stock dividends, every stockholder must have known that at least one-half of such stock dividends had been *in excess of 6%*. Under such a factual situation upon what basis can it be found that the settlor of this trust *intended* stock dividends *not in excess of 6%* to be considered "income" or "net income" payable to the life tenants? Would it not be more logical for the settlor, aware of the stock dividend policy of this Company, to intend that *all* stock dividends, those not in excess and those in excess of 6%, be considered "income" or "net income" payable to the life tenants? We fail to see that

---

on the trust shares. If [the life tenant] sold the stocks distributed to him immediately he would have realized this amount; if he retained them, including subsequent stock dividends thereon, he has received from this trust 93,156 shares of the Company's stock which would have been worth as of December 31, 1954, $6,520,920 absolutely tax free."

[4] Exhibit A attached to the Stipulation of Counsel.

the past dividend policy of the Company could reflect an intent on the part of the settlor to include only stock dividends not in excess of 6% to "income" or "net income" payable to the life tenants, a limitation which the majority opinion clearly imposes.

It is further interesting to note that, in the years from 1932 up to and including 1961, the Sun Oil Company paid 14 yearly stock dividends in excess of 6% and only 9 stock dividends of 6% or less. Would the majority hold that the settlor intended *all* of these stock dividends to be considered "net income" payable to the life tenants or *only* such stock dividends of 6% or less. There is not a scintilla of evidence on this record upon which to sustain the finding of an intent on the part of the settlor to have stock dividends of 6% or less included within "net income"; on the contrary, the record would more likely, *if at all,* sustain a finding of *intent,* based on the past stock dividend history of the Company, that the settlor intended to include in "net income" *all* stock dividends of the Company regardless of the amount.

I submit that the dilemma in which the majority of this Court finds itself is occasioned by its refusal either to follow the ruling in *Catherwood* or to reverse *Catherwood.* To escape from this dilemma, a formula is invented by which, it is hoped, the ruling in *Catherwood* can be circumvented. The result is that the conclusion of the majority constitutes a clear violation of the language of the Act, for which neither factually or legally a justifiable basis exists.[5]

---

[5] Furthermore, by the result reached, the majority of this Court avoid determining the *principal* questions raised on this appeal, i.e., whether the application of the ruling in *Catherwood* to this trust violates the due process clause of the 14th Amendment of the U. S. Constitution, the impairment of contract clause of Article I, §10, Clause 1 of the U. S. Constitution and Article I, §17 of the Pennsylvania Constitution and the "law of the case" set forth in *Pew Trust,* 362 Pa. 468, 67 A. 2d 129.

In my opinion, the position taken by the Court in *Catherwood* is salutary and I must dissent from the attempt, implicit in the majority opinion, either to undermine the stability or avoid the application of *Catherwood*.

I would affirm the decree.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I agree with Justice JONES and Judge TAXIS of the court below that the settlor did not "direct" the apportionment between principal and income so as to bring this trust within the proviso clause of section 2 of the Principal and Income Act.

I likewise agree that our decision in *Catherwood* with respect to the retroactive application of the Act to ordinary stock dividends is entitled to as much weight as our decision with regard to extraordinary stock dividends—a determination which the majority apparently accepts. Moreover, no reason is advanced by the majority why our decision in *Catherwood* that ordinary stock dividends are subject to the Principal and Income Act should now be overruled.

I would go further, however, and hold that the retroactive application of the Act to ordinary stock dividends does not violate due process or constitute an impairment of the obligation of contracts, as contended by appellant. As we held in *Catherwood*, "[t]here is no vested property right in a court-made rule of apportionment." [405 Pa. at 77]. Instead of undermining the Act of 1947 and our decision in *Catherwood,* as the majority does, I would give appellant the opportunity to question the constitutionality of *Catherwood* before the United States Supreme Court—the obvious purpose of this litigation.

Accordingly, I dissent.